UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

STANLEY WALTER SEPTIC
TANK CLEANING LLC,

              Plaintiff,

       v.                                    Case No.  12-C-0317

MACK TRUCKS, INC.,

              Defendant.

DECISION AND ORDER DENYING STANLEY WALTER SEPTIC TANK
CLEANING LLC's MOTION FOR SUMMARY JUDGMENT (DOC. 22) AND DENYING
MACK TRUCKS, INC.'S MOTION FOR SUMMARY JUDGMENT (DOC. 26)

      Stanley Walter Septic Tank Cleaning LLC purchased a 2012 Mack truck that turned out to be a "lemon" under Wisconsin's "Lemon Law." Stanley sues Mack Trucks, Inc., seeking damages, costs, and attorney fees pursuant to Wis. Stat. § 218.0171. Cross-motions for summary judgment are now before the court, and for the reasons set forth below, those motions will be denied.

      Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials show that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of the cause of action, showing that there is a genuine issue for trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence

in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to continue. *Id.* at 247-48. "Material" means that the factual dispute is outcome determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

Because the parties in this case have filed cross-motions for summary judgment, many facts are not contested. When no genuine issue of material fact exists, the sole question is whether the moving party is entitled to judgment as a matter of law. *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996). Nevertheless, when both parties have moved for summary judgment, each is required to show that no genuine issue of material fact exists, taking the facts in the light most favorable to the party opposing each motion. If a genuine issue of material fact exists, neither party is entitled to summary judgment. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983).

The court has diversity jurisdiction over this matter and venue is proper in the Eastern District of Wisconsin because a substantial portion of the events occurred here.[1]

_____

[1]According to the Notice of Removal, the sole member of the plaintiff limited liability company is a citizen of Wisconsin. (Doc. 1 ¶ 5.) The defendant is incorporated in Pennsylvania and maintains its principal place of business in North Carolina. (Doc. 28 ¶ 3.)

The parties agree that Wisconsin substantive law applies.  *See Erie R.R. Co. v. Thompkins*, 304 U.S. 64, 78 (1938).   The court must apply state substantive law as enacted by the state legislature and as interpreted or declared by the state's highest court.  *See Home Valu, Inc. v. Pep Boys – Manny, Moe and Jack of Del., Inc.*, 213 F.3d 960, 963 (7th Cir. 2000); *see also Erie*, 304 U.S. at 78-79.   However, if the Wisconsin Supreme Court has not spoken on an issue and the law is unclear, this court must predict how the state supreme court would decide the question presented.  *Rodman Indus., Inc. v. G & S Mill, Inc.*, 145 F.3d 940, 942 (7th Cir. 1998).   In such instances, decisions of the state's intermediate appellate courts are authoritative unless there is a split among them or "there is a compelling reason to doubt that the courts have got the law right."  *Rekhi v. Wildwood Indus., Inc.*, 61 F.3d 1313, 1319 (7th Cir. 1995), *quoted in Home Valu, Inc.*, 213 F.3d at 963.

Federal courts sitting in diversity should hesitate to expand state law in the absence of any indication of intent by the state courts or legislature.  *King v. Damiron Corp.*, 113 F.3d 93, 97 (7th Cir. 1997).   Nevertheless, when faced with two equally plausible interpretations of state law, the federal court should choose the interpretation that restricts liability rather than an interpretation that creates more liability.  *Home Valu, Inc.*, 213 F.3d at 963.

## UNDISPUTED FACTS[2]

Stanley Walter Septic Tank Cleaning LLC, also known as Stan Walter Septic, operates in Waukesha, Wisconsin, and specializes in cleaning septic tanks, holding tanks,

---

[2]Under applicable local rules, the summary judgment movant files proposed statements of material fact, the opposing party responds to those and files additional proposed statements of material fact, then the movant responds to the latter.  The local rules do not provide for replies to the opposing party's responses.  *See* Civil L.R. 56(b)(3).  Yet, Mack provided such a reply to Stanley Walter Septic Tank Cleaning's responses.  (*See* Doc. 46.)  Therefore, the court will not consider the reply.

and grease traps. (Doc. 28 ¶¶ 2, 4.[3]) To provide its services, Stan Walter Septic uses highly specialized trucks requiring specific components and dimensions. (Doc. 28 ¶ 5.) Allen Walter owns the company. (Doc. 28 ¶ 9.)

Mack Trucks, Inc. manufactures heavy-duty trucks. It builds some vehicles for dealers to carry as stock inventory and custom builds others to satisfy requirements for the state where it will be operated and for the body that will be attached. (Doc. 30 ¶ 4; Doc. 28 ¶ 79; Doc. 35 ¶ 22.)

On December 28, 2010, Stan Walter Septic purchased a 2012 Mack GU813 truck (the "2012 truck") from Milwaukee Truck Sales (the "dealership"). (Doc. 28 ¶ 7.) The 2012 truck was custom built to meet the specific business needs of Stan Walter Septic. (Doc. 28 ¶ 8.) Allen Walter, owner of the company, was not interested in purchasing a truck from Mack's current inventory. He wanted the truck to be custom engineered with air ride suspension, a double frame, a set back double axle, a 445-cubic-inch engine, and a thirteen-speed transmission. (Doc. 28 ¶¶ 10-16.) Moreover, the truck needed a wheel base measuring exactly 240 inches and a load platform measuring 244 inches to accommodate a septic tank. (Doc. 28 ¶ 17.) Walter also required that the truck be painted blue. (Doc. 28 ¶ 21.) Further, for the truck to operate in Wisconsin, certain weight had to be placed on the rear axles. (Doc. 28 ¶ 22.)

The 2012 truck was delivered in April 2011. (Doc. 28 ¶ 26; Doc. 31 Ex. C at 17.[4]) The septic tank was not supplied by Mack and was added later by a separate company.

---

[3]Unless otherwise noted, a proposed finding of fact cited by the court is undisputed or written in the light most favorable to the opposing party.

[4]Mack's proposed finding of fact, undisputed by Stan Walter Septic, states the year as 2012, but that date postdates the filing of this case. The deposition of Martin Zens confirms that the correct year is 2011.

(Doc. 28 ¶ 18.)  Sometime after delivery of the 2012 truck, Stan Walter Septic began experiencing various issues with the vehicle.  (Doc. 28 ¶ 27.)

On February 3, 2012, Stan Walter Septic mailed Mack a Lemon Law notice.  (Doc. 28 ¶ 28; Doc. 25 ¶ 1.)  Mack received the notice on February 6 or 7, 2012.  (Doc. 28 ¶ 29; Doc. 34 ¶ 29; Doc. 31 Ex. M; Doc. 25 ¶ 2; Doc. 26 ¶ 2.)  In the notice, Allen Walter demanded that Mack accept return of the 2012 truck and provide him with a comparable new vehicle.  (Doc. 28 ¶ 30.) Walter made it clear that only a truck that met the exact specifications of the 2012 vehicle would be acceptable to him.  (Doc. 28 ¶ 31.)

The key specifications for determining whether a vehicle is comparable are the wheel base, load platform, engine, transmission and configuration of the rear and front axles.  (Doc. 28 ¶ 43.)  The 2012 truck was a model GU813;  the wheel base and the load platform are the two most unique qualities of the model.  (Doc. 28 ¶¶ 44, 45.)

Upon receipt of the Lemon Law notice, Mack began its evaluation, including a search for a vehicle that would accommodate Stan Walter Septic's specific needs. (Doc. 28 ¶ 32.)  Mack requested that Martin Zens of the dealership complete the vehicle search because he had ordered the 2012 truck and was familiar with Stan Walter Septic's needs and the specifications of the 2012 truck.  (Doc. 28 ¶ 33.)

Zens took two approaches to locate a comparable vehicle.  (Doc. 28 ¶ 35.)  First, he checked the inventory records of dealers in Stevens Point, Wisconsin; Minneapolis, Minnesota; Twin Bridges, Iowa; Chicago, Illinois; and Michigan.  (Doc. 28 ¶ 36; Doc. 34 ¶ 36; Doc. 31 Ex. C at 29, 32-34.)  Zens does not recollect calling anyone at the dealers, but may have called one; instead, he checked dealer inventory records.  (Doc. 35 ¶ 17; Doc. 47 ¶ 17.)  Second, Zens completed a national search using a Mack database named "Dog Catcher."  (Doc. 28 ¶ 37.)  Dog Catcher lists trucks manufactured by Mack that are

located at Mack authorized dealerships and available to those dealerships for purchase through interdealer transfers. (Doc. 31 Ex. C at 8, 37, Ex. E at 10.) However, Dog Catcher contains only those trucks that dealerships may have in excess or may have had a hard time selling. (Doc. 31 Ex. C at 37, Ex. E at 10.) Zens did not contact dealerships outside the Wisconsin region in part because he knew that it was highly unlikely that a dealership outside the region would have trucks meeting Wisconsin specifications. (Doc. 28 ¶ 39; Doc. 34 ¶ 39; Doc. 31 Ex. C at 37-38.)

Zens was directed by Mack to search for a truck that was "identical" and "exactly the same, not similar" to the 2012 truck. (Doc. 35 ¶ 16; Doc. 47 ¶ 16.) Zens searched for model, engine, wheel base, transmission, color, double versus single frame, set forward axles, and set back axle. (Doc. 47 ¶ 16; Doc. 31 Ex. C at 35.) However, he was unable to locate a vehicle that met Stan Walter Septic's specifications. (Doc. 28 ¶ 40.)

Martin Kehs, Mack's Director of Custom Order Fulfillment, asked Tom Riley, Supervisor of Application Engineering, to search Mack's past and present build history to determine whether there were any vehicles comparable to the 2012 vehicle available during the 2008-2012 time frame. (Doc. 28 ¶ 42.) Consequently, Mack searched for any GU813 models with a 240-inch wheel base and a 244-inch load platform. (Doc. 28 ¶ 46.) The search provided information on all of the trucks that were built or scheduled to be built with the specified wheel base and load platform from February 6, 2008, to March 18, 2013. (Doc. 28 ¶ 47.) Kehs then reviewed the specifications for these trucks to determine whether any of these vehicles were comparable to the Stan Walter Septic's vehicle and whether any vehicle was available between February 2012 and March 2012. (Doc. 28 ¶ 49.)

According to Mack, the 2012 truck and the vehicle eventually provided to Stan Walter Septic were the only two trucks built by Mack between February 6, 2008, and March 18, 2013, with the requisite wheelbase, load platform and "comparable specifications." (Doc. 28 ¶ 48.) However, Stan Walter Septic proffers evidence that there were fifty-two or fifty-five GU8 trucks with the requisite wheelbase and load platform that were manufactured between February 6, 2008, and March 18, 2013. (Doc. 34 ¶ 48; Doc. 31 Exs. H, I; Doc. 30 Ex. B; Doc. 35 ¶ 12; Doc. 47 ¶ 12.[5]) Additionally, Kehs acknowledges that he could not tell Stan Walter Septic's counsel how many GU813 trucks were in Mack's inventory between February 6 and March 7, 2012. (Doc. 34 ¶¶ 50, 51; Doc. 31 Ex. G at 34-35.)

By letter dated March 7, 2012, Mack informed Stan Walter Septic that it would provide a comparable new vehicle and components added at the point of sale. (Doc. 28 ¶ 52; Doc. 4.) The letter indicated that the vehicle could not be tendered within thirty days of the Lemon Law notice because no such vehicle existed; to provide the new vehicle with Stan Walter Septic's specifications Mack would need to build a new vehicle, which necessarily included the acquisition and installation of component parts. (Doc. 28 ¶¶ 53, 54.) The letter advised that comparable components could not be obtained and installed by the thirty-day deadline and that Mack had placed an order for the construction of a new vehicle on the next available build date. (Doc. 28 ¶ 55; Doc. 34 ¶ 55.[6])

In 2011 through 2012 the general process for building Mack vehicles was (1) a Mack dealer would place an order with Mack's Order and Distribution Department; (2) the Sales Engineering Group evaluated the order to confirm that specifications were accurate; (3) the

_____

[5]Both parties point to printouts that require more information than this court has to interpret them.

[6]Stan Walter Septic objects to this proposed finding and disputes whether the order was indeed placed for the next available build date. However, the proposed finding concerns only what the letter said, not whether the build date actually was the next available.

proposed specifications go to the Probuilder Group to confirm the vehicle is properly engineered; (4) after the specifications are confirmed as appropriate the vehicle is processed for production; and (5) the vehicle is slotted on the assembly line. (Doc. 28 ¶ 84.) Some parts are kept in stock. (Doc. 33 Ex. A at 36.) Other parts ("line sequence parts"), such as the cab, chassis, and engine, are specific to each vehicle and are not kept in stock; those parts need to be obtained from a supplier and possibly built after the specifications in the order have been confirmed. (Doc. 28 ¶¶ 87, 88; Doc. 33 Ex. A at 36.) Mack must provide twenty days' notice to its line sequence parts suppliers, and most suppliers start to build the parts about fifteen days before Mack wants to put the truck on the assembly line. (Doc. 35 ¶ 1; Doc. 47 ¶ 1; Doc. 33 Ex. A at 37.) The line sequence parts are delivered to Mack approximately two or three days before the build process begins. (Doc. 35 ¶ 2; Doc. 47 ¶ 2; Doc. 33 Ex. A at 37.)

The time needed to engineer and build a vehicle depends on the specifications, availability of parts, and the overall volume of vehicles being produced. Typically, engineering and production of a Mack vehicle from order entry through the end of production averages seven to nine weeks. (Doc. 28 ¶¶ 90, 91; Doc. 34 ¶ 91.) The average time for a truck on the production line is five to ten days. (Doc. 35 ¶ 3; Doc. 47 ¶ 3; Doc. 33 Ex. A at 32-33.) During the spring of 2012 Mack produced approximately 116 vehicles per day; within that 116 vehicles per day was a mix of models. (Doc. 28 ¶¶ 95, 96.) Although "[t]raditionally" the building of a truck cannot be expedited, instances have occurred where Mack has been able to do so upon request. (Doc. 35 ¶ 11; Doc. 47 ¶ 11; Doc. 33 Ex. A at 28-29.)

Mack claims that providing Stan Walter Septic with a comparable new vehicle was a top priority. (Doc. 28 ¶ 57.) Zens; Joseph Favia, Mack's District Sales Manager; and

Jeffrey Roberts, Mack's District Manager for the Midway District, were aware that providing Stan Walter Septic with a comparable new vehicle was urgent. (Doc. 28 ¶¶ 63, 64.) Favia informed Roberts that Mack needed to find a comparable vehicle as soon as possible. (Doc. 28 ¶ 64.) Favia maintains that he and Roberts verbally informed Mack's order and distribution department that the truck to be expedited and "shipped hot." (Doc. 28 ¶¶ 66, 67; Doc. 31 Ex. F at 47.) Zens believes he conveyed to Mack a sense of urgency. (Doc. 31 Ex. C at 24-25.)

However, Lightkep, the manager of the production and scheduling department for Mack's truck production facility, did not receive notice that the replacement truck was related to a Lemon-Law case or a request that the truck order be expedited. (Doc. 33 Ex. A at 8, 26-27.) Nor was he aware of anyone else within his department receiving an email or phone call requesting that the replacement truck be expedited. (Doc. 33 Ex. A at 27.) Similarly, Kehs, the director of customer order fulfillment for Mack, was not aware of anyone within the order and distribution group being contacted regarding a need to expedite the production of the replacement vehicle. (Doc. 35 ¶ 9; Doc. 47 ¶ 9.)

On February 14, 2012, Zens had requested a build date even though the dealership had yet to place an order for the replacement vehicle. (Doc. 28 ¶ 62.) As of February 14, 2012, the first available build slot was approximately May 19, 2012. (Doc. 28 ¶ 61.[7]) Zens had requested a lead-time assessment on February 13, 2012, in the event a comparable vehicle could not be located, using a build date of May 19, 2012. (Doc. 28 ¶ 58; Doc. 31 Ex. C at 21.) The lead time assessment estimates how quickly Mack can get the vehicle on the production line. (Doc. 28 ¶ 59.)

_____

[7]Stan Walter Septic disputes this proposed finding of fact but its response is not on point and thus does not contradict the proposed finding. The response focuses on the lead time assessment being based on the build date; it does not attack whether the build date was the first available.

The order for the new vehicle had to be placed by the dealer. (Doc. 28 ¶ 68.) Zens formally placed the order for the replacement vehicle on March 12, 2012. (Doc. 28 ¶ 70; Doc. 35 ¶ 5; Doc. 47 ¶ 5.) Placement of the order was delayed because Allen Walter was debating whether to change the transmission on the new vehicle; however, that delay did not alter the build slot or delay the build process. (Doc. 28 ¶¶ 71-73; Doc. 37 ¶ 100.[8])

Mack began assembling the new vehicle on May 21, 2012, and the vehicle was finished on May 25, 2012. (Doc. 28 ¶¶ 74, 75; Doc. 25 ¶ 6; Doc. 36 ¶ 6.) The new truck was flagged by Mack as "hot for delivery," meaning that shipment was expedited. (Doc. 28 ¶¶ 76, 77.) The build process for the replacement vehicle took over ten weeks. (Doc. 35 ¶ 7; Doc. 47 ¶ 7.) However, assembly by Mack did not mean the vehicle was complete; certain add-ons had to be completed at the dealership and the body or tank had to be transferred from the 2012 truck at Advance Pump & Equipment in Iowa. (Doc. 47 ¶ 6; Doc. 31 Ex. C at 76; Doc. 40 ¶ 8; *see* Doc. 37 ¶ 107; Doc. 44 ¶ 107.)

The replacement vehicle likely arrived at the dealership on or before June 8, 2012. (Doc. 37 ¶ 104; Doc. 31 Ex. C at 75.[9]) After the vehicle's delivery the dealership observed a problem with the paint on the hood of the truck. The hood was removed and sent to Mack's Madison body shop for repainting. (Doc. 25 ¶ 11; Doc. 36 ¶ 11; Doc. 31 Ex. C at 60.) At some point Allen Walter went to the dealership to look at the replacement truck and was told that the truck had been shipped out for repainting. (Doc. 24 ¶ 2.)

---

[8]Stan Walter Septic disputes that the actual build slot was the same as if the order had been received on February 14, 2012, but its response is not on point and focuses on Zens's request for the build date back in February.

[9]Stan Walter Septic disputes this proposed finding, but at deposition Zens testified that he dated a document about the replacement truck as June 8, 2012, and that normally such a document is prepared when he sees a truck come in. (Doc. 31 Ex. C at 75.)

By letter dated July 13, 2012, counsel for Mack advised counsel for plaintiff that the replacement vehicle was completed and ready for the body transfer.  (Doc. 25 ¶ 9; Doc. 36 ¶ 9; Doc. 19 Ex. N.)  The body transfer was scheduled for July 16 through July 20, 2012. (Doc. 37 ¶ 109.)  However, Mack did not get the go-ahead to send the truck to Advance for the body transfer in July 2012, and that date was lost.  (Doc. 37 ¶ 110.)  Stan Walter Septic refused to arrange to have the body transferred until the parties agreed to a stipulation on damages. (Doc. 37 ¶ 115.)

Allen Walter called the dealership in September 2012 asking to look at the truck. He was told by the dealership that the truck had been sent to Madison to have the entire cab repainted.  (Doc. 43 Ex. A.)  In December 2012, Mack contacted Advance to schedule a mounting date for the tank.  Advance advised that Mack should drop off the truck after December 15, 2012, and that it would complete the body transfer the first week of January. Moreover, Mack reserved this mounting slot.  (Doc. 37 ¶ 119; Doc. 44 ¶ 119.) The truck arrived at Advance, in Peosta, Iowa, on or about December 17, 2012.  (Doc. 37 ¶¶ 120, 121.)

In early January, Advance discovered a problem with the "saddles" and that the rear truck frame was not level.  (Doc. 37 ¶ 122; Doc. 19 Ex. O at 48.)  Because a tank was to be transferred to the vehicle, the vehicle left the manufacturer with two bare frame rails. (Doc. 37 ¶ 125.)  Advance determined that the frame was not level by placing a level across the bare frame rails.  (Doc. 44 ¶ 125; Doc. 19 Ex. P.)  Mack shipped the truck back to the dealership in Milwaukee, where Mack's service team worked to identify and resolve the issue.  (Doc. 37 ¶ 123.) The problem was eventually traced to certain suspension tolerances, which were remedied by the insertion of a spacer provided by the suspension manufacturer.  (Doc. 37 ¶ 124.)  Once the repairs were completed, the vehicle was

returned to Advance in Iowa for final assembly. (Doc. 37 ¶ 128.)  In the meantime, the parties filed a stipulation with this court on January 8, 2013, regarding the exchange of the 2012 Mack GU813 and the 2013 Mack GU813 and this ongoing action.

On February 6, 2013, Mack's counsel informed Stan Walter Septic's counsel that Mack was ready to exchange the vehicles.  (Doc. 37 ¶ 130.)  Allen Walter picked up the truck on or about February 15, 2013.  (Doc. 37 ¶ 131; Doc. 44 ¶ 131.)  However, Walter saw a leak in the air system.  (Doc. 24 ¶ 4.)  The dealership repaired multiple small leaks (Doc. 24 ¶ 5; Doc. 37 ¶ 134; Doc. 44 ¶ 134) and Stan Walter Septic took deliver of the replacement truck on or about March 6, 2013.

## DISCUSSION

Wisconsin's Lemon Law provides in pertinent part that if a new motor vehicle "does not conform to an applicable express warranty" and the nonconformity is not cured after a "reasonable attempt to repair," then the consumer may return the vehicle to the manufacturer and elect to receive either a comparable replacement vehicle or a refund. Wis. Stat. § 218.0171(2)(a)-(b); *Marquez v. Mercedes-Benz USA, LLC*, 2012 WI 57, ¶ 2, 341 Wis. 2d 119, ¶ 2, 815 N.W.2d 314, ¶ 2. A manufacturer violates the Lemon Law if it fails to voluntarily comply with the elected remedy within thirty days after receipt of the consumer's demand. Wis. Stat. § 218.0171(2)©; *Marquez*, 2012 WI 57, ¶ 3.

Section 218.0171 does not define "comparable new motor vehicle," but Wisconsin courts have interpreted the phrase to mean "a similar model vehicle with similar features, such as the type of engine, transmission, brakes, seat upholstery and accessories." *Dussault v. Chrysler Corp.*, 229 Wis. 2d 296, 303, 600 N.W.2d 6, 10 (Ct. App. 1999).  In its Lemon Law notice to Mack, Stan Walter Septic requested an exchange of the lemon for a comparable truck.  Therefore, Mack was required to provide Stan Walter Septic with a

truck having at a minimum the same engine, transmission, brakes, and other similar features.

The parties agree that Mack did not provide Stan Walter Septic with a comparable vehicle within the thirty-day statutory period. However, the issue is whether Mack has a sustainable defense regarding that failure. Mack argues impossibility—it could not comply with the Lemon Law because it was impossible to provide Stan Walter Septic with a comparable motor vehicle within thirty days of receiving the notice. Due to the time needed for engineering, acquiring parts, and assembling materials, Mack maintains that building a comparable truck required more than thirty days' notice. Moreover, says Mack, even if it were possible to comply with the thirty-day notice, Stan Walter Septic thwarted its compliance with the statutory period by demanding an identical (as opposed to a comparable) vehicle, failing to timely finalize the specifications for the new vehicle, and demanding that Mack sign a stipulation before Stan Walter Septic would take delivery of the replacement truck.

Stan Walter Septic contends that no impossibility defense exists under the Lemon Law and that summary judgment in its favor is warranted because the parties agree that Mack failed to provide a replacement vehicle within thirty days of the Lemon Law notice. However, says Stan Walter Septic, in the event the court recognizes an impossibility defense, Mack still violated the Lemon Law because it failed to replace the 2012 truck within a reasonable time, taking a full year after expiration of the thirty-day period.

1.    The Impossibility Defense

According to the Supreme Court of Wisconsin, the Wisconsin legislature enacted the Lemon Law to "ensure that purchasers stuck with lemons could promptly be put in approximately the same position they were in before purchasing the lemon and that they

could reach this position without the hassle, expense, and risk of litigation." *Marquez*, 2012 WI 57, ¶ 26. Wisconsin's Lemon Law is particularly pro-consumer in many ways, including the provision of remedies of double damages and attorneys' fees, and, pertinent to this case, the absence of expressly stated affirmative remedies. *Id.* ¶¶ 28, 32. The principal motivation for the law's exacting remedies "is not to punish the manufacturer because a lemon escaped from the plant," but to provide an incentive to the manufacturer "'to promptly return those unfortunate consumers back to where they thought they were when they first purchased that new automobile.'" *Id.* ¶ 29 (quoting *Hughes v. Chrysler Motors Corp.*, 197 Wis. 2d 973, 987, 542 N.W.2d 148 (1996)).

No Wisconsin cases have dealt specifically with the theory of impossibility in providing a comparable replacement vehicle within the statutory period. However, in *Marquez* the Supreme Court of Wisconsin recognized a defense to a Lemon Law claim when a consumer intentionally prevents the manufacturer from providing a refund within thirty days. *Marquez*, 2012 WI 57, ¶ 33. Moreover, the court acknowledged that a defense of impossibility for providing a refund within thirty days exists in narrow instances. *See id.* ¶ 34.

In *Marquez,* the consumer provided Mercedes-Benz with the requisite Lemon Law notice and elected a refund, but Mercedes-Benz failed to provide the refund within thirty days. When sued, the company raised the affirmative defense that the consumer had thwarted its attempt to provide a refund within thirty days by failing to provide necessary information. *Id.* ¶ 13. The Supreme Court of Wisconsin recognized the defense but held that the manufacturer had to prove that the consumer intentionally, not negligently, prevented the manufacturer from providing a refund within thirty days. *Id.* ¶ 33.

The court noted that a timely remedy for the consumer is a "critical component" of the Lemon Law. *Id.* ¶ 32. Affirmative defenses for a manufacturer make a consumer's recovery more uncertain and make litigation more likely and more time-consuming. Further, "[m]anufacturers are better equipped to manage uncertainty, delay, and expense surrounding Lemon Law claims and may even prefer uncertainty and delay." *Id.* However, though noting that no affirmative defenses are explicitly stated in the law, the court accepted that affirmative defenses may exist. *See id.* ¶ 33. But "any affirmative defenses or 'excuses' for a manufacturer should be narrow, in keeping with the statutory purposes of aiding the purchaser." *Id.* ¶ 33. The court found that a broad affirmative defense based on a consumer's unintentional conduct did not comport with the legislature's intent; only intentional action preventing a timely refund would justify the exception. *Id.*

Importantly for the present case, the court commented on other possible bases for a manufacturer's affirmative defense, in particular impossibility:

> We recognize that situations might arise in which a consumer does not intentionally prevent a manufacturer from complying with the 30-day statutory period but in which it is nevertheless impossible for a manufacturer to gather the necessary information to make a refund. For example, a consumer provides adequate notice to the manufacturer, thereby starting the 30-day period, but then falls into a coma or gets lost in the wilderness and the manufacturer, without needed information from the consumer, cannot comply with the statutory refund requirements within 30 days. In such unlikely scenarios, a manufacturer might very well have to take creative steps to protect against the exacting penalties. The present case does not, however, pose a situation in which the manufacturer tried to comply with great diligence and unlikely events outside of its control or outside of the control of a consumer made the manufacturer's compliance impossible.

*Id.* ¶ 34.

In light of *Marquez*, this court believes the Supreme Court of Wisconsin would recognize a defense of impossibility if submitted at trial in the present case. This court sees no reason to treat the remedy of a refund differently than the remedy applicable to

a replacement vehicle. Thus, a consumer's intentional thwarting of the replacement remedy may support an affirmative defense. Similarly, there may exist circumstances, though rare, in which it is impossible for a manufacturer to comply with the consumer's chosen remedy of replacement. In fact, a defense of impossibility appears more justified in the context of a replacement, which, as here, may involve custom-built vehicles, than in the refund context, involving only monetary payment. *Cf. Ash Park, LLC v. Alexander & Bishop, Ltd.*, 2010 WI 44, 324 Wis. 2d 703, 783 N.W.2d 294 (recognizing the defense of impossibility to specific performance).

As stated above, the Lemon Law was not designed as punishment for the manufacturer but as an incentive to solve a lemon problem. Holding a custom-vehicle manufacturer strictly liable for failure to build a new vehicle in thirty days does not further the goal of the statute. A custom-vehicle manufacturer that will be on the hook financially will have no incentive to move as quickly as it could; if replacement within thirty days is impossible, it will be liable for double-damages whether it provides a new vehicle in forty-five days or one hundred days or three hundred days. Nor was the goal of the Lemon Law to provide a windfall for a consumer based on the type of remedy chosen. The purchaser of a lemon custom-built vehicle who chooses a replacement that cannot be made within thirty days would benefit over the consumer who chooses a refund. Moreover, the Lemon Law was presumably passed with consumers and manufacturers of generally available vehicles in mind. Hence, this court hesitates from expanding liability under state law. Also, strict liability treatment of custom-vehicle manufacturers could be seen as broader liability than the liability of mass-produced motor vehicles.

Nevertheless, an impossibility defense for a Lemon Law untimeliness claim cannot give the manufacturer broad permission to delay replacement. As indicated by the

Supreme Court of Wisconsin, the defense requires that the manufacturer have tried to comply with great diligence yet unlikely events outside of its or the consumer's control precluded compliance. Moreover, the purpose of the statute is prompt correction of the lemon problem, and the Supreme Court of Wisconsin recognized that manufacturers may prefer delay. Thus, even after the thirty days has expired the manufacturer must continue to act with diligence and the replacement must be prompt, taking into consideration the circumstances of the particular situation.

Because the court finds that an impossibility defense exists under state statutory law and caselaw, Mack's constitutional arguments need not be addressed. *See Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1126 (7th Cir. 1995) (providing that constitutional adjudication is a last resort and courts should do what they can to decide on other grounds). Further, the court's determination that Mack can raise an impossibility defense means that the court cannot grant Stan Walter Septic's motion for summary judgment on the ground that the thirty-day period has passed.

Mack contends that the complaint alleges only that Mack violated the thirty-day period and not some longer period. Thus, it maintains that if an impossibility defense exists, the case is over. The court disagrees. The complaint asserts that despite the Lemon Law notice, "the defendant failed or refused to provide the appropriate relief provided for the by the [sic] Lemon Law sought by the Plaintiff in a timely manner without imposing conditions not required by the Wisconsin Lemon Law." (Doc. 1-1 Ex. A, ¶ 10.) Further, the complaint asserts that because "the defendant did not provide the appropriate relief provided for by the Wisconsin Lemon Law, sought by the Plaintiff, in a timely manner, the defendant has violated sec. 218.0171, Wis. Stats." (Doc. 1-1 Ex. A, ¶ 12.) These allegations sufficiently extend beyond solely a claim about the thirty-day period. Moreover,

plaintiffs have to assert facts, not legal theories. *See Ryan v. Ill. Dep't of Children & Family Servs.*, 185 F.3d 751, 764 (7th Cir. 1999). Even if the complaint did not cover a legal theory regarding timeliness following expiration of the thirty-day period, the court would allow the argument at this time. As discussed above, an impossibility defense does not eliminate all time constraints; the manufacturer does not have permission to delay replacement indefinitely.

    2.       Whether Replacement Within Thirty Days Was Intentionally Thwarted

Mack claims that Stan Walter Septic thwarted compliance with the statutory period because it demanded an identical vehicle and took time contemplating changes to the specifications for a replacement vehicle: Mack received the dealership's order for the replacement vehicle in early March 2012. It is undisputed that plaintiff debated changing the transmission but ultimately decided not to do so. However, Mack admits that this delay did not delay the build process. Indeed, Mack admits that the actual build slot in late May 2012 was the same build slot that would have been assigned had the order been received on February 14, 2012, when Zens called to reserve the slot. A reasonable jury could find that plaintiff's delay in finalizing the replacement order did not affect the production date. Moreover, a reasonable jury could find that plaintiff did not *intentionally* delay the order to thwart compliance with the statute.

As for plaintiff's requirement of an identical vehicle, questions of fact exist precluding summary judgment in either party's favor. The Lemon Law notice sought a comparable vehicle, but what Allen Walter or his attorneys conveyed to Mack after that letter is unclear. Further, "comparable" may mean "identical" in the custom vehicle realm. As stated above, a comparable vehicle has been described as "a similar model vehicle with similar features, such as the type of engine, transmission, brakes, seat upholstery and accessories."

*Dussault*, 229 Wis. 2d at 303.  But in the custom-vehicle context, for a Wisconsin truck that requires certain measurements to carry a tank, "comparable" may mean "exactly the same" wheel base, load platform, and particulars that satisfy Wisconsin requirements.  As recognized in *Dussault*, any ambiguity in the meaning of "comparable new vehicle" must be resolved in light of the intent of the Lemon Law:  placing the purchaser of a new vehicle back in the position it would have been in at the time the first vehicle was purchased. Thus, "comparable" for a custom-vehicle lemon may include identical features that make the vehicle fit for its purpose.  Moreover, nothing suggests that any communications from or demands by Stan Walter Septic requiring an identical vehicle, if made, were intended to thwart provision of a replacement truck by Mack in a timely manner.  Based on the present record, taking the facts in the light most favorable to each party, a reasonable jury could find in favor of either party on these points.

Next, Mack contends that its diligent efforts to timely deliver a replacement vehicle were prevented by plaintiff's refusal to arrange for the body transfer in July 2012.  In response to Mack's letter on July 13, 2012, relaying that the replacement vehicle was available and ready for the body transfer, plaintiff's counsel said that Stan Walter Septic would not accept exchange of the vehicle until the parties agreed to a stipulation on damages.  The parties did not reach agreement until January 8, 2013.  Consequently, Mack contends that but for plaintiff's refusal to exchange the vehicle when it was available in July 2012, Mack could have identified and rectified the air leaks six months earlier. Therefore, Mack submits that plaintiff unnecessarily delayed timely delivery of its replacement vehicle.

Again, questions of fact exist as to the cause of the delay and whether plaintiff intentionally thwarted Mack's compliance with the Lemon Law.  Taking the facts in

plaintiff's favor, problems with the paint persisted into September, was justified in requiring some agreement after that date because of the present case, and delay was not intended to frustrate delivery. Taking the evidence in the light most favorable to Mack, the replacement truck was ready and available in July 2012 and plaintiff intentionally chose not to take delivery of the vehicle. If that is so, delay subsequent to that should not be attributed to Mack. Consequently, summary judgment must be denied on the issue of whether plaintiff thwarted Mack's ability to comply with the Lemon Law.

3.      Whether Replacement Within Thirty Days Was Impossible

Mack asserts that compliance with the Lemon Law was impossible because it could not logistically provide plaintiff with a vehicle matching the 2012 truck's specifications within thirty days. However, the court cannot grant summary judgment to Mack on this claim without proof that Mack exercised sufficient diligence in locating or building a comparable motor vehicle for plaintiff. And on several points there are questions of fact.

According to Mack, it did everything within its control to search for an existing comparable vehicle. As soon as practicable after learning of the situation, Zens looked at the inventories at several dealerships in or close to Wisconsin and completed a national search for vehicles using Dog Catcher. Further, the 2012 truck and the replacement vehicles were the only vehicles built over recent years with the exact wheel base, load platform and other "comparable specifications" (Doc. 28 ¶ 48) required by plaintiff. These facts could support a jury verdict in Mack's favor. However, a reasonable jury could find in plaintiff's favor as well. Dog Catcher listed only those vehicles that dealers could not sell on their own, i.e., overstocks or slow-moving models, not every available vehicle. Zens did not call Midwestern dealerships to confirm their inventory lists. And approximately fifty vehicles were built in recent years with the same wheelbase and load platform. A jury

would not be required to agree with Mack regarding what other "comparable specifications" these potential replacement vehicles lacked.

After Mack found its searches unfruitful, it committed to building plaintiff a vehicle from scratch. However, whether Mack was diligent in the build process is a question of fact. Mack says that it diligently built the replacement vehicle as soon as possible, and some facts support such a finding. Viewing the facts in Mack's favor, the May build date was the first available, and Mack built the replacement truck in five days, which is less than its average build time. Further, several Mack employees knew that production needed to be expedited and passed that information to others within the company. Mack expedited its shipping process, and the paint issue was resolved in mid-July 2012, at which time the vehicle was ready for delivery to Advance.

But viewing the facts in plaintiff's favor, Zens requested the first available build date as if this was an order in the regular course of business; nothing indicates that Mack was unable to bump another vehicle off the production line or otherwise secure an earlier date because of urgency. The vehicle was built about fourteen weeks after Zens requested the date and ten weeks after the formal order was placed, while the average time for a custom truck is seven to nine weeks. No one in Mack's production and scheduling department received a request that the replacement truck be expedited. Moreover, Mack's director of customer order fulfillment was not aware of anyone within the order and distribution group being contacted to expedite production of the replacement vehicle, even though the vehicle was flagged for expedited delivery. Later, paint issues were not resolved until September 2012. Thus, impossibility is an issue of material fact that precludes granting summary judgment on behalf of either party.

For the above-stated reasons,

IT IS ORDERED that Stanley Walter Septic Tank Cleaning, LLC's motion for summary judgment (Doc. 22) and Mack Trucks, Inc.'s motion for summary judgment (Doc. 26) are denied.

Dated at Milwaukee, Wisconsin, this 27th day of March, 2014.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE